OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 Defendant was charged with rape in the third degree (Penal Law § 130.25 [1]) after he admitted to having sexual intercourse with a 33-year-old woman whom he knew to have mental retardation. The sole issue at trial was whether she was legally incapable of consent.
 
 [1]
 
 While this remains the
 
 *84
 
 central question on appeal, an additional issue before us concerns the business records rule.
 

 Complainant, Sherry K., was an employee of the Steuben Association of Retarded Citizens (ARC), a sheltered workshop that provided opportunity and support for adults who are mentally retarded. One Monday morning in July 1991, she told her counselors — in accordance with her instruction on responding to sexual abuse — that she and defendant had engaged in sexual intercourse the previous weekend. In her own words, defendant had asked her to pull down her pants and, although she told him "don’t do no more,” he "put his go potty thing” inside her. Upon questioning, defendant, who was a cousin of Sherry K.’s stepfather, admitted the encounter, but insisted it was at her instigation and with her consent.
 
 [2]
 

 According to testimony from her mother and stepfather, complainant had suffered brain damage at birth. She lived in an apartment attached to her parents’ home, but was unable to cook for herself, handle money, perform anything other than repetitive tasks or cope with variation from her daily routine. She had a steady boyfriend with whom she went out to eat and visit acquaintances in the supervised community where he lived.
 

 Found not capable of comprehending the nature of the oath, Sherry K. gave unsworn testimony. As her testimony revealed, she could not spell her last name or correctly state her age. While she knew the purpose of the birth control pills prescribed for her was to prevent pregnancy, she did not know what pregnancy was, or "where babies come from,” and did not know about venereal disease.
 

 Linda Kent, complainant’s counselor at ARC, had advanced training in vocational habilitation of adults with mental retardation and worked intensively with the ARC employees to assist them in succeeding at employment. In complainant’s case, Kent reviewed her programs twice yearly, and helped her formulate developmental goals. Kent assisted her in managing her money, and counselled her about personal problems, seeing her at least twice a day at the center. Over defense counsel’s objection, the prosecutor elicited testimony from
 
 *85
 
 Kent establishing that a clinical report contained in Sherry K.’s ARC file showed her IQ to be 50. That result, according to Kent, placed her on "the high end of the moderately retarded” range, the type of person admitted to ARC. Kent’s work was limited to persons with IQs above 50, persons who are "trainable,” and she was very familiar with this range of functioning.
 

 Within the ambit of the training given to Sherry K. through ARC was education in recognizing and preventing sexual abuse. She had been told she had the right to say "no” to any conduct that made her uncomfortable, whether at home, in the community or in the workshop. She had been instructed to report immediately any touching of her body. Over defense counsel’s objection that Kent lacked expertise in determining capacity to consent to sexual intercourse, Kent was allowed to testify that complainant did not appreciate the connection between intercourse and pregnancy. Kent had asked Sherry K., on two occasions, whether she understood this connection, and both times she made clear that she did not.
 

 The court delivered a charge based on Criminal Jury Instructions (2 CJI[NY] PL 130.25), directing that the complainant should be found unable to consent to sexual intercourse if she was "so mentally defective as to be incapable of appraising the nature of her conduct,” and setting forth factors relevant to that determination. Defendant was convicted of rape in the third degree and sentenced to an indeterminate term of imprisonment.
 

 On appeal, defendant contends that Kent was wrongly allowed to give "expert testimony” about the complainant’s mental capacity, and that in the absence of expert testimony on that question, the evidence was insufficient to establish defendant’s guilt. Defendant also argues that receipt into evidence of the psychologist’s report — which the Appellate Division found to be error, but harmless — required reversal. We now affirm.
 

 I
 

 "Mental retardation” is not a disease, disorder or disability, but a less-than-satisfactory administrative term used to identify the condition of a broad spectrum of people whose common trait is inadequate cognitive ability to meet the demands of society (Hayman,
 
 Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent,
 
 103 Harv L Rev 1202,
 
 *86
 
 1213, 1248, n 249). Such an impairment may arise from any number of causes, including birth defect, head injury, disease and environmental factors, conditions leading to no common symptomatology in physiology, psychology, intellect or affect
 
 (id.,
 
 at 1214). Mental retardation is not necessarily a static condition, for experience has shown that with effective training and support, individuals are able to lead increasingly "normal” lives (Christian,
 
 Normalization as a Goal: The Americans with Disabilities Act and Individuals with Mental Retardation,
 
 73 Tex L Rev 409, 413).
 

 Our jurisprudence recognizes certain limitations on the ability of a legally incapacitated person to consent to participate in sexual relations. That limitation is an exercise of the State’s
 
 parens patriae
 
 interest, invoked only where the individual is deemed unable to make a competent decision concerning a fundamental right
 
 (see, Rivers v Katz,
 
 67 NY2d 485, 496).
 

 Under New York law, it is an element of every sex offense that the sexual act was committed without the consent of the victim (Penal Law § 130.05 [1]). Where a person is legally incapacitated, the law does not recognize any claim that the person "consented” to sex and criminalizes sexual intercourse with that person (Penal Law § 130.05 [2] [b]).
 

 The burden the People must meet to establish legal incapacity is a high one. Under the statutory scheme, the People must prove case-by-case that a victim’s functioning is so impaired as to be "mentally defective” (Penal Law § 130.05 [2] [b]). By that standard, the victim must suffer "from a mental disease or defect which renders him incapable of appraising the nature of his conduct” (Penal Law § 130.00 [5]). The law does not presume that a person with mental retardation is unable to consent to sexual intercourse (Penal Law § 130.25 [1]), and proof of incapacity must come from facts other than mental retardation alone.
 
 [3]
 

 This Court considered application of these standards in
 
 People v Easley
 
 (42 NY2d 50, 54-55), and declined to "adopt the fiction that all persons are mentally or judgmentally equal.” We took care to note that
 
 (supra,
 
 at 54-55):
 

 "[a]s do all others, the mentally aberrant differ from one another in greater or lesser degree. Even
 
 *87
 
 mental retardation does not mean that an individual is incapable of consenting as a matter of law. The requisite degree of intelligence necessary to give consent may be found to exist in a person of very limited intellect (see 1 Wharton, Criminal Law and Procedure, § 310;
 
 Hacker v State,
 
 73 Okla Cr 119). Crucial to a determination may be how such a person actually functions in society (Lind-man, Mentally Disabled and the Law [American Bar Foundation, rev ed], p 226).”
 

 In
 
 Easley,
 
 we discussed what it meant to be incapable of appraising the nature of one’s own sexual conduct
 
 (see,
 
 42 NY2d, at 55-58). Understanding the "nature” of one’s sexual conduct implicates a range of human responses, only a part of which is intellectual. We noted that care must be taken not to restrict the freedom of persons with mental retardation who are capable of knowing consent to a sexual relationship by confusing deliberate failure to adhere to a particular set of values with lack of understanding that values exist. Only the latter — a lack of understanding — is an appropriate consideration in assessing legal capacity.
 

 Defendant does not quarrel with this legal standard, but urges that the People cannot meet their burden under
 
 Easley
 
 without presenting some admissible expert testimony as to a complainant’s capacity to consent, testimony that he argues is absent in this case.
 

 As we noted in
 
 Rivers v Katz,
 
 however, determination of capacity is a judicial, not a medical, function (67 NY2d, at 48-49). The question whether a person possesses sufficient resources — intellectual, emotional, social, psychological — to determine whether to participate in sexual contact with another is an assessment within the ken of the average juror, who likely has made the same determination at some point.
 
 [4]
 
 We concluded in
 
 Easley
 
 that this assessment is best based on evidence concerning the victim’s ability to function in society (42 NY2d, at 55). People who observe the complainant daily— family members, teachers, employers — are often most familiar with his or her capacity to cope with challenge and can
 
 *88
 
 illuminate for the jury the complainant’s ability to understand and cope with a sexual encounter.
 

 Here, just such evidence was presented through the testimony of Sherry K. herself, as well as that of her parents and counselor, and it was sufficient for the jury to conclude that at the time of this incident, she lacked capacity to appreciate the nature of her participation in sexual conduct with defendant. There was no suggestion that her encounter with defendant arose out of an emotional bond. While that alone is surely not dispositive, it is relevant to whether the encounter with defendant was primarily exploitative of her, the type of harm the law most seeks to guard against by this provision. Complainant displayed no understanding that defendant was married, or that engaging in sexual conduct with him might be considered inappropriate.
 

 While Sherry K. promptly reported the incident to her counselors, her testimony was that she did so not because of awareness that a wrong had occurred, but because she had been instructed to inform the ARC staff if she were intimately touched by another and did not want to get in trouble with the staff by failing to heed its instructions.
 

 The testimony of Linda Kent, contrary to defendant’s contention, was not introduced as expert testimony on the question whether complainant was capable of comprehending the nature of her sexual conduct. Rather, Kent served as a fact witness, describing her own experience with Sherry K.
 

 Taken as a whole the People’s evidence sufficiently established that complainant’s cognitive, social, psychological and emotional limitations — known to defendant — were severe enough to prevent her from understanding at the time of the incident the nature of her own conduct in engaging in sexual intercourse with defendant. Nor did the evidence suggest she comprehended what defendant was doing when she asked him to stop touching her. Because she was not able to consent to his actions, the evidence was sufficient to support defendant’s conviction of rape in the third degree.
 

 II
 

 Defendant also contends that the IQ test report, prepared by psychologist Frederick Rohrs in 1979 at the time of Sherry K.’s admission into ARC, failed to meet the evidentiary standards of a business record under CPLR 4518. The report was admitted for the truth of its contents — that the complainant
 
 *89
 
 had an IQ of 50 — and was therefore hearsay. In order to admit the record without the testimony of Rohrs, the foundation requirements of CPLR 4518 (a), made applicable to criminal proceedings by CPL 60.10
 
 (People v Kennedy,
 
 68 NY2d 569, 578), must be satisfied.
 

 The Appellate Division held that there was "no evidence concerning the circumstances” under which the report was made. We conclude, however, that in the particular circumstances presented, the testimony of Linda Kent established the requisite foundation for admission of this evidence.
 

 The three foundation requirements of CPLR 4518 (a) are outlined in
 
 Kennedy
 
 (68 NY2d, at 579-580): first, the record must be made in the regular course of business — reflecting a routine, regularly conducted business activity, needed and relied on in the performance of the functions of the business. Second, it must be the regular course of business to make the record — in other words, the record was made pursuant to established procedures for the routine, habitual, systematic making of such a record. Finally, the record must have been made at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter, assuring that the recollection is fairly accurate and the entries routinely made.
 

 There was no dispute at trial that complainant had some degree of mental retardation. The only question was whether her impairment prevented her from consenting to participating in sexual conduct with defendant. Kent testified not as an expert witness on that question but as a fact witness, familiar with Sherry K.’s daily routine and her response to new situations. The subject of the report arose while Kent was describing the extent of her familiarity with complainant and her limitations. That testimony also established that she was well familiar with the circumstances under which Rohrs’ report was prepared.
 

 Kent testified that in order to carry out her evaluation and counseling of Sherry K., she had to know her medical and psychological background and therefore maintained all relevant records, including medical, psychological and social histories. ARC accepted only clients determined to have mild or moderate retardation, with IQs of lower than 75.
 

 Through further questioning, the People established that Kent recognized Rohrs’ report as an initial evaluation prepared in accordance with ARC’S requirements. No one was accepted into the program without such a report. Kent worked
 
 *90
 
 with these reports as part of her regular course of business at ARC, and they were relied on both in making determinations as to suitability of candidates for admission and in formulating their program once at ARC.
 

 The face of the report stated that the evaluation — a "Comprehensive Psychological Evaluation for Diagnosed Mental Retardates” — had taken place at the request of the New York State Office of Vocational Rehabilitation (OVR), and concluded with a recommendation that Sherry K. be placed at Steuben County ARC. By statute, OVR contracts with sheltered workshops such as ARC to provide services to clients, and the law requires periodic review to determine the ongoing suitability of the program for the individual (Education Law § 1004-a [2], [5]). Rohrs’ evaluation was therefore prepared on behalf of both OVR and Steuben County ARC
 
 (cf., Matter of Leon RR,
 
 48 NY2d 117, 123).
 

 Because the report was prepared for ARC, in conformity with its procedures, the fact that Rohrs was not himself an ARC employee does not, under these facts, defeat admission. It is true that as a rule, "the mere filing of papers received from other entities, even if they are retained in the regular course of business, is insufficient to qualify the documents as business records”
 
 (Standard Textile Co. v National Equip. Rental,
 
 80 AD2d 911;
 
 see also,
 
 Yachnin,
 
 The Business Record
 
 Rule—
 
 CPLR 4518 (a)
 
 — Worth
 
 Learning and Never Forgetting,
 
 NYLJ, May 30, 1995, at 12, col 5 [objection for lack of foundation warranted when "the writing is a business record but received from another business entity”]). The reason for this rule is that "[s]uch papers simply are not made in the regular course of business of the recipient, who is in no position to provide the necessary foundation testimony as to the regularity and timeliness of their preparation or the source of information contained in the records” (Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 4518:1, at 105). Nor, generally, would the recipient be aware whether the information was imparted by one under a "business duty” to report to the entrant
 
 (see, Johnson v Lutz,
 
 253 NY 124).
 

 Those concerns are not present here, however, because Rohrs was acting on behalf of ARC and in accordance with its requirements when he prepared the report. While not an ARC employee, Rohrs was also not a complete outsider. And although Kent could not relate Rohrs’ specific recordmaking practices, she was able to state that the report conformed with
 
 *91
 
 the statutory and regulatory requirements with which she was familiar. Coupled with her testimony that no client was accepted into the ARC program without such a report, and that the reports were routinely relied on by ARC in making determinations regarding its clients, the evidence was sufficient to establish that Rohrs’ report, prepared at the time the examination was conducted, was made in the regular course of business and that it was the regular course of business to prepare such reports
 
 (Kelly v Wasserman,
 
 5 NY2d 425, 429). These circumstances — the indicia of reliability characteristic of a business record
 
 (Kennedy,
 
 68 NY2d, at 577-579) — supported the trial court’s conclusion that the report was a business record under CPLR 4518 (a), and the evidence was thus properly received.
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Judges Simons, Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order affirmed.
 

 [1]
 

 . Pursuant to Penal Law § 130.25, a person is guilty of rape in the third degree when:
 

 "1. He or she engages in sexual intercourse with another person to whom the actor is not married who is incapable of consent by reason of some factor other than being less than seventeen years old; or
 

 "2. Being twenty-one years old or more, he or she engages in sexual intercourse with another person to whom the actor is not married less than seventeen years old.”
 

 [2]
 

 . Where incapacity arises solely because the victim is "mentally defective, mentally incapacitated or physically helpless,” it is an affirmative defense that the defendant, at the time he engaged in the conduct, was unaware of the facts or conditions responsible for such incapacity to consent (Penal Law § 130.10). Defendant did not assert the affirmative defense.
 

 [3]
 

 . Penal Law § 130.25 (2), in contrast, creates an irrebuttable presumption that a child less than 17 years of age cannot consent to sexual intercourse with an adult of 21 years or older.
 

 [4]
 

 . This is not to say that expert testimony would be inadmissible
 
 (see, e.g., People v Parks,
 
 41 NY2d 36, 47). Assuming the requisite foundation
 
 (People v Bennett,
 
 79 NY2d 464, 472-473), such testimony may be helpful, for example, where the victim’s behavior contradicts an assertion of incapacity
 
 (People v Taylor,
 
 75 NY2d 277, 292-293).